FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 09, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DUANE L.,[1]

             Plaintiff,

     v.

LELAND DUDEK, Acting
Commissioner of Social Security,[2]

             Defendant.

No.   4:24-cv-343-EFS

**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR MORE PROCEEDINGS**

Plaintiff Duane L. asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 2 and Title 16 benefits. One of Plaintiff's arguments is that the ALJ erred by not finding intermittent explosive disorder to be a severe impairment. The Court agrees the ALJ erred at step two. Because this error

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Leland Dudek has been named the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g), he is hereby substituted as the Defendant.

impacted the ALJ's disability evaluation, remand for further proceedings is required.

### I.     Background

Plaintiff applied for Title 2 and Title 16 benefits, claiming disability beginning April 1, 2012, based on mental-health and intellectual impairments.[3] After the agency denied benefits, ALJ Marie Palachuk held a telephone hearing in October 2023, at which Plaintiff and a vocational expert testified.[4] Plaintiff testified that he completed either 7th or 8th grade and that he had been in special education for most of his schooling.[5] Later he attempted to obtain his GED but he was unable to pass the tests due to difficulties reading and concentrating.[6] He said that he was able to pass the knowledge portion of his driver's examination on the third try after studying extensively at home.[7] He testified that he probably lost prior jobs due to his attitude, as he gets angry when someone exercises their "authority a little too far and push[es his] buttons."[8] He has worked several jobs in

---

[3] AR 170–71.

[4] AR 35–69.

[5] AR 40.

[6] AR 40.

[7] AR 41.

[8] AR 48.

the past but they are typically only one-day or up to one year.[9] He testified that he volunteered at a local food bank for about two days a week; he "would go down and give them a hand, like going and getting food from Safeway, and bringing it back to their place, and dropping it off. And then that was pretty much it."[10] Sometimes he would help pass out food or bag up food when the food bank handed out food every other weekend.[11] He stopped volunteering at the food bank when his friend who worked there died.[12] He testified that he smokes marijuana every day because "it kind of winds me down sometimes."[13] He stated he is unable to "keep my head on one thing at a time," as "it's bouncing all over the place," and he has borderline intelligence.[14] During a typical day, he does a variety of things, such as helping others with house projects or spending time in nature, as he tries not to stay in the house or else he and his wife will end up arguing.[15] Plaintiff also testified that he has been having problems with feeling in his fingers and toes.[16]

---

[9] AR 48–50.

[10] AR 51.

[11] AR 51.

[12] AR 51.

[13] AR 52.

[14] AR 53.

[15] AR 54–55.

[16] AR 60.

After the hearing, the ALJ issued a decision denying benefits.[17] The ALJ found Plaintiff's alleged symptoms were "not entirely consistent with" the medical evidence and other evidence.[18] The ALJ considered the lay statement from Plaintiff's wife.[19] The ALJ found each of the medical opinions and prior administrative findings unpersuasive:

- The psychological evaluations of Donald Bonner, EdD, Douglas Brady, PhD, and Thomas Horner, PhD, were unpersuasive because they were "too attenuated in time and not illustrative of the claimant's functioning during the period at issue."[20]

---

[17] AR 14–34. Per 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[18] AR 23. As recommended by the Ninth Circuit in *Smartt v. Kijakazi*, the ALJ should consider replacing the phrase "not entirely consistent" with "inconsistent." 53 F.4th 489, 499, n.2 (9th Cir. 2022).

[19] AR 27.

[20] AR 26. For this same reason, the ALJ found unpersuasive a letter from a Learning Disability Specialist in 1982 that generally described that Plaintiff's ability to attend to and complete tasks, retain information, and manage his attitude and behavior had improved with medication. AR 26 (citing AR 282, 302, 1187).

- The prior administrative findings of W. Miller Logan, PhD, and Michael Brown that the record was insufficient to substantiate the presence of a severe impairment were unpersuasive because the treatment records established severe mental impairments and limiting effects.[21]

As to the sequential disability analysis, the ALJ found:

- Plaintiff met the insured status requirements through December 31, 2013.

- Step one: Plaintiff had not engaged in substantial gainful activity since April 1, 2012, the alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments: learning disorder/borderline intellectual functioning, attention-deficit/hyperactivity disorder (ADHD), and polysubstance abuse disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations:

---

[21] AR 26–27. The record does not reflect what Michael Brown's medical degree was, simply stating, "Medical Specialty Code: 38 Psychology." AR 86.

> The claimant is able to understand, remember, and carry out simple, routine tasks and instructions. He is able to maintain concentration, persistence, and pace on simple routine tasks for the two-hour intervals between regularly scheduled breaks. He needs to be in a predictable environment. He can have no fast-paced work production, such as an assembly line pace. He can have occasionally [sic] and superficial interaction with the public and coworkers and no work around crowds. Instructions should be by demonstration or orally, but not written. Reading should not be an essential function of the job.

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff can perform work that exists in significant numbers in the national economy, such as cleaner II, church janitor, and laundry aide.[22]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[23]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error" and such error impacted the nondisability determination.[24] Substantial evidence is "more than a mere scintilla but less than

---

[22] AR 17–29.

[23] AR 1–6.

[24] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds*

DISPOSITIVE ORDER - 6

1  a preponderance; it is such relevant evidence as a reasonable mind might accept as

2  adequate to support a conclusion."[25]

3                        **III.    Analysis**

4        Plaintiff argues the ALJ improperly evaluated the medical evidence, causing

5  error at steps two, three, and five. In response, the Commissioner defends the

6  ALJ's assessment of Plaintiff's mental impairments, the listings, and the RFC. As

7  is explained below, the ALJ's step-two finding, and resultingly the ALJ's listings

8  and RFC findings, are not supported by substantial evidence.

9  **A.    Step Two: Plaintiff establishes consequential error.**

10       Plaintiff argues that the ALJ erred at step two by failing to find intermittent

11  explosive disorder and intellectual dysfunction as severe impairments. The

12  _____

13  *by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ

14  decision due to a harmless error—one that "is inconsequential to the ultimate

15  nondisability determination").

16  [25] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir.

17  1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The

18  court "must consider the entire record as a whole, weighing both the evidence that

19  supports and the evidence that detracts from the Commissioner's conclusion," not

20  simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*,

21  143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does

22  not indicate that such evidence was not considered[.]").

23

Commissioner argues the ALJ recognized the substantial overlap in symptomology between Plaintiff's different mental and intellectual impairments and incorporated the effects of each of Plaintiff's impairments—severe or not—into the RFC. As is explained below, on this record, which lacks a recent treating or consultative psychological evaluation, the Court determines the ALJ's omission of either a conduct disorder or an adjustment disorder as a severe impairment at step two was an error and such error impacted the ALJ's disability analysis and crafting of an RFC that did not limit Plaintiff's interaction with supervisors.

    1.    <u>Step-two standard</u>

At step two, the ALJ determines whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits his physical or mental ability to do basic work activities.[26] This involves a two-step process: 1) determining whether the claimant has a medically determinable impairment, and 2) if so, determining whether the impairment is severe.[27] To be severe, the medical evidence must establish that the impairment would have more than a minimal effect on the claimant's ability to work.[28]

---

[26] 20 C.F.R. §§ 404.1520(c), 416.920(c).

[27] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[28] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see* Soc. Sec. Rlg. (SSR) 85-28 (Titles II and XVI: Medical Impairments That Are Not Severe).

Neither a claimant's statement of symptoms, nor a diagnosis, nor a medical opinion sufficiently establishes the existence of an impairment.[29] Rather, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."[30] If the objective medical signs demonstrate the claimant has a medically determinable impairment,[31] the ALJ must then determine whether that impairment is severe.[32]

The severity determination is discussed in terms of what is *not* severe.[33] A medically determinable impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to

---

[29] *Id.* §§ 404.1521, 416.921.

[30] *Id.* §§ 404.1521, 416.921. *See also* SSR 85-28 at *4 ("At the second step of sequential evaluation . . . medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.").

[31] "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements (symptoms)." *Id.* §§ 404.1502(g), 416.902(l).

[32] *See* SSR 85-28 at *3.

[33] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

1    work."[34] Because step two is simply to screen out weak claims,[35] "[g]reat care

2    should be exercised in applying the not severe impairment concept."[36] Step two "is

3    not meant to identify the impairments that should be taken into account when

4    determining the RFC" as step two is meant *only* to screen out weak claims,

5    whereas the crafted RFC must take into account all impairments, both severe and

6    non-severe.[37]

7        2.    <u>ALJ's step-two findings</u>

8        At step two, the ALJ found that Plaintiff had the severe impairments of

9    learning disorder/borderline intellectual functioning, ADHD, and polysubstance

10    abuse disorder. The ALJ recognized that the record included diagnoses of other

11    non-severe impairments:

12        [T]he undersigned finds that those impairments that are not
        specifically mentioned reveal only a slight abnormality having such
13        minimal effect on an individual that it would not be expected to
        interfere with the individual's ability to work, irrespective of age,
14        education or work experience and are therefore, non-severe.

15        Although the above impairments do not have more than a minimal
        impact on the claimant's ability to engage in basic work activities,
16        non-severe impairments can, when considered in conjunction with one
        another and the claimant's severe impairments, affect a claimant's
17        residual functional capacity. In recognition of this fact, and in
        accordance with Social Security regulations, any such effect that the

18    _____

19    [34] *Id.*; *see* SSR 85-28 at *3.

20    [35] *Smolen*, 80 F.3d at 1290.

21    [36] SSR 85-28 at *4.

22    [37] *Buck v. Berryhill*, 869 F.3d 1040, 1048–49 (9th Cir. 2017).

23

    DISPOSITIVE ORDER - 10

claimant's non-severe impairments would have on his ability to function have been considered when formulating the claimant's residual functional capacity, SSR 96-8p.[38]

At step two, the ALJ did not mention that Plaintiff had been diagnosed with intermittent explosive disorder (a conduct disorder) or with an adjustment disorder.[39]

---

[38] AR 20–21.

[39] A conduct disorder "involves a consistent pattern of aggressive and disobedient behaviors." Cleveland Clinic, *Conduct disorder*, http://my.clevelandclinic.org/health/diseases/23924-conduct-disorder (last visited March 19, 2025). For instance, intermittent explosive disorder "involves repeated, sudden bouts of impulsive, aggressive, violent behavior or angry outbursts." Mayo Clinic, *Intermittent explosive disorder*, https://www.mayoclinic.org/diseases-conditions/intermittent-explosive-disorder/symptoms-causes/syc-20373921 (last visited March 19, 2025). The impulsive outbursts may occur suddenly and may be separated by weeks or months. It is a long-term condition, but the severity of outbursts may lessen with age, therapy, or medication. Whereas an adjustment disorder is a strong reaction to stress or trauma with short-term symptoms that affect thoughts, behaviors, and emotions. Cleveland Clinic, *Adjustment disorders*, https://my.clevelandclinic.org/health/diseases/21760-adjustment-disorder (last visited March 19, 2025).

DISPOSITIVE ORDER - 11

It was error for the ALJ to not find a conduct disorder or an adjustment disorder as a severe impairment. The medical record reflects that from the age of eight Plaintiff struggled with impulsivity and controlling his anger, even though during that psychological evaluation he also presented as friendly and talkative.[40] Then, during a psychological evaluation when Plaintiff was 15 years old, Dr. Bonner observed Plaintiff with "impulsive drawings and erasures" and noted that Plaintiff was "very hypersensitive and very inhibited in his feelings" and that Plaintiff's work on a motor test suggested "a tendency toward explosiveness and violent behavior."[41] Dr. Bonner diagnosed Plaintiff with attention deficit disorder (by history), conduct disorder (group type by history), borderline mental retardation (by testing), and borderline personality features (possibly of an organic basis). During a psychological evaluation by Thomas Horner, PhD, in January 2022 when Plaintiff was 29 years old, Dr. Horner observed Plaintiff with very polite manners, mild restlessness, variable impulse control, articulate speech although mildly pressured at times, adequate language and attention/concentration, grossly preserved abstract attitude, dysphoric affect/mood, and low, grossly normal intelligence.[42] Dr. Horner diagnosed Plaintiff on Axis I with intermittent explosive disorder, childhood ADD continuing in adulthood, depression, history of alcohol

---

[40] AR 1178–82.

[41] AR 642.

[42] AR 317–26.

and cocaine abuse; and on Axis II with personality disorder and borderline intelligence. Based on their observations and testing, both psychologists diagnosed Plaintiff with not only intelligence and attention-deficit disorders, but also a conduct disorder, which Dr. Horner diagnosed as intermittent explosive disorder.

In addition to the observations and findings at these evaluations, the more recent mental-health treatment records indicate that Plaintiff continues to struggle with impulsivity and anger management. For instance, during Plaintiff's counseling sessions with Timothy Day, PhD, from August to December 2021, Plaintiff reported that he expresses his frustration by shouting at objects or swearing, and that to reduce the likelihood of continued negative personal interactions he removes himself from the situation.[43] Dr. Day diagnosed Plaintiff

---

[43] AR 385–86 (Sept. 2, 2011: "Today, he would like to discuss interventions to assist in managing outbursts of anger. For example, he described episodes where something will go wrong and he will begin to shout at the object. [He] acknowledged that this can frighten his partner as well as his pets."); AR 381–82 (Nov. 10, 2021: "this appears to increase anger and externalize behaviors, such as raising his voice"); AR 378 (Dec. 14, 2021: "He continues to struggle with intermittent periods of anger although reported directing his anger to inanimate objects and that these episodes are mild in nature. He also tries to remove himself from situations that exacerbate anger.").

1  with adjustment disorder with anxious mood.[44] In January 2022, at the direction of

2  his wife, Plaintiff went to the emergency department to seek a referral for

3  continued outpatient mental-health counseling to help with anger management.[45]

4  During the May 2022 therapy session with Jason Giese, LMHC, Plaintiff was

5  observed with restless psychomotor activity.[46] Like his statements to Dr. Day,

6  Plaintiff reported to Counselor Giese that he removes himself from situations, such

7  as by spending time outside, to reduce anger outbursts.[47] Counselor Giese treated

8  Plaintiff for his adjustment disorder with mixed anxiety and depressed mood.[48]

9          Based on this record, the ALJ's step-two findings, which did not include

10  either a conduct disorder or an adjustment disorder as a severe impairment, is not

11  supported by substantial evidence. If Plaintiff's anger or impulsivity related to his

12  conduct disorder or adjustment disorder causes him to interact negatively with a

---

14  [44] AR 380.

15  [45] AR 368–71.

16  [46] AR 610–12.

17  [47] *See, e.g.*, AR 1043–45 ("He reports when he gets angry it just happens

18  instantaneously, and then he has to isolate himself to cool down."); AR 1275 (He

19  "will pay attention to stressful situations what level his irritation-anger reaches on

20  scale of 1-10, and how his body feels at the time and what the thoughts are he's

21  having at the time" to learn how to keep his anger down.).

22  [48] AR 1272.

1    supervisor or to step away from his work tasks this will impact his ability to

2    sustain work.[49]

3        3.    <u>The step-two error impacted the ALJ's evaluation</u>

4        The Commissioner argues that any step-two error was inconsequential

5    because the ALJ discussed Plaintiff's anger and impulsivity in other portions of her

6    decision, i.e., when discussing the B Criteria at step 3, when evaluating Plaintiff's

7    reported mental-health symptoms, and when evaluating the medical opinions. A

8    close inspection of the ALJ's analysis on these points, however, reveals the

9    consequential impact of the ALJ's omission at step two of either a conduct disorder

10    or an adjustment disorder.

11        a.    <u>*The ALJ's evaluation of Plaintiff's symptoms—and in turn the*</u>

12              <u>*listings—was impacted.*</u>

13    When discussing the listing's B Criteria, the ALJ mentioned the:

14    record does indicate many instances of the claimant reporting
      difficulty getting along with his wife and experiencing outburst. *See*
15    *generally, e.g.*, Ex. 7F. However, according to his statements, the
      claimant is also able to shop, spend time with friends and family, and
16    volunteer at a food bank. Ex. 5E; 7F at 11; 15F at 123. Moreover, on
      examination, the claimant consistently was observed as pleasant,
17    cooperative, and interactive with normal speech and eye contact. Ex.
      3F at 15; 4F at 26, 30, 32, 36, 49, 62, 64, 70, 84, 97, 114; 7F at 5, 9, 17,
18    19, 23; 14F at 4; *but see* Ex. 4F at 91. Even so, he was observed at
      times as irritable. Ex 4F at 29. Taken in whole, the evidence indicates
19    no more than a moderate limitation in this area.[50]

                                                    . . .
20

21

      [49] AR 67–69 (vocational expert's testimony).
22

      [50] AR 21–22.
23

Finally, the claimant has moderate limitations in his ability to adapt or manage himself. The claimant asserted that he has difficulties handling stress. Ex 5E. That said, the claimant also stated that he is able to care for his wife['s] pets, as well as volunteer at a food bank. Ex 5E, 15F at 123. At times during the relevant period, the claimant presented with tearful affect, nervous/anxious/depressed mood, agitation and/or restless behavior. Ex. 4F at 20, 39, 91, 107. More often, however, he presented with appropriate grooming, mood, and affect. Ex. 3F at 15; 4F at 9, 17, 24, 26, 28, 30, 32, 36, 47, 61, 75, 100; 7F at 5, 9, 17, 19, 25. Accordingly, the overall evidence demonstrates no more than a moderate limitation in this area.[51]

Then, when evaluating Plaintiff's reported symptoms,[52] the ALJ stated:

---

[51] AR 22.

[52] *See Smartt*, 53 F.4th at 499 (requiring the ALJ to "show his [or her] work and provide a "rationale clear enough that it has the power to convince" the reviewing court as to the ALJ's evaluation of Plaintiff's symptom reports). Factors to be considered by the ALJ when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; 6) any non-treatment measures the claimant uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the claimant's functional limitations and restrictions due to pain

1
2
3
4
5

> As a threshold matter, the undersigned is cognizant of the substantial overlap in symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses. Throughout the record, there are several mental diagnoses for the claimant. After reviewing these diagnoses and their corresponding symptoms, the undersigned feels that the above stated impairments are most consistent with the record. Accordingly, the claimant's psychological symptoms and their effect on his functioning have been considered together, instead of separately, regardless of the diagnostic label attached.[53]

6
7
8

As to Plaintiff's reported anger, frustration, and other similar symptoms, the ALJ mentioned that Plaintiff:

9
10
11
12
13
14
15
16
17

- reported in July 2013 occasional outbursts of anger.

- reported in November 2021 ongoing struggles with anger, frustration, and anxiety regarding interpersonal relationships.

- reported in December 2021 "intermittent periods of anger, mild in nature."

- "presented with agitation and anxiety."

- reported "arguing with his wife all morning."

- was observed with "agitation, depressed mood, and anxious affect."[54]

18
19
20
21
22
23

---

or other symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); SSR 16-3p at *7.

[53] AR 24.

[54] AR 24–25.

The ALJ found Plaintiff's reported mental-health symptoms not consistent with the medical evidence because of: 1) the "many instances of normal or mild mental status examinations," 2) he "often reported improving symptoms," and 3) he "reported activities of daily living and abilities, such as helping care for his wife, cooking, caring for pets, driving, shopping, counting change, handling a savings account, volunteering at the food bank, and spending time with friends and family, indicating a higher level of functioning than alleged."[55]

The ALJ's omission of either a conduct disorder or an adjustment disorder as a severe impairment resulted in the ALJ failing to consider that Plaintiff's anger-control issues are not symptoms that he experiences continuously but rather intermittently.[56] Thus, that Plaintiff was often observed as pleasant, cooperative, and interactive with normal speech and eye contact was not necessarily a reason to discount his symptoms resulting from a conduct or adjustment disorder. During his therapy sessions, Plaintiff routinely discussed that he has interpersonal problems with his wife and that he must remove himself from an upsetting situation to

---

[55] AR 26.

[56] *See Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012) (finding the ALJ erred by not finding panic disorder to be a severe impairment because the other severe mental impairments of bipolar disorder, mixed personality disorder, anxiety, and borderline intellectual functioning did not encapsulate each of the symptoms caused by panic disorder).

prevent his anger—and yelling—from escalating. Yet, such removal/isolation

behavior may be inconsistent with the ability to sustain fulltime work, as the

vocational expert testified that an employer will not routinely allow an individual

to be off task more than 10% of the workday and will not allow repeated

outbursts.[57]

In addition, the ALJ fails to explain why Plaintiff's activities of daily living

were inconsistent with Plaintiff's impulsivity and anger-control issues. The ALJ's

reliance on Plaintiff's volunteering at the food bank did not fairly consider that

Plaintiff reported that he only volunteered parttime and that he stopped

volunteering after his friend passed away.[58]

        b.    <u>*The ALJ erred by not obtaining a more recent medical opinion.*</u>

The only treating or consultative psychological medical opinions of record

were consultative psychological opinions from Plaintiff's youth and early

adulthood. As mentioned above, the ALJ found these opinions unpersuasive

because they were "very distant from the period at issue" and were not "illustrative

---

[57] AR 67–69.

[58] *Compare Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982) (recognizing that the ability to engage in sheltered work does not correspond to an ability to engage in fulltime gainful work).

1    of the claimant's functioning during the period at issue."[59] These prior

2    psychological opinions included a:

3    •   psychological evaluation by Dr. Bonner in April 1988 when Plaintiff was

4        15 years old. He observed Plaintiff with "impulsive drawings and

5        erasures" and his work on a motor test suggested "a tendency toward

6        explosiveness and violent behavior."[60] Plaintiff was "very hypersensitive

7        and very inhibited in his feelings."[61] Dr. Bonner opined that it would be

8        expected for Plaintiff to be impulsive, socially nonconforming, and to have

9        very poor relations at school and home. Dr. Bonner noted that Plaintiff

10       had a "history of combativeness," and he was concerned that Plaintiff

11       "may be a threat to other people on the Unit."[62]

12   •   psychological evaluation (Luria-Nebraska neuropsychological test

13       battery) by Douglas Brady, PhD, in May 1988 when Plaintiff was 15

14       years old, diagnosing Plaintiff with an intellectual processing impairment

15       and attention deficit disorder.[63] Dr. Brady opined that the "possibility of

---

[59] AR 26.

[60] AR 642.

[61] AR 642.

[62] AR 640.

[63] AR 646–48.

him functioning in a normal classroom setting or in a verbal or insight orientated psychotherapy setting is very poor."

- psychological evaluation by Dr. Horner in January 2002, when Plaintiff was 29 years old, wherein Dr. Horner opined that Plaintiff's prognosis was poor and that his abilities to make change and pay a bill were low.[64] Dr. Horner also noted that "hostility seems to come pretty naturally for him."[65]

As to prior administrative psychological findings, the ALJ found unpersuasive the opinions of Dr. Logan and Mr. Brown.[66] Both Dr. Logan and Mr. Brown found the record—at the time they reviewed it in 2022—did not contain sufficient evidence to adjudicate Plaintiff's claim, although they did find him to have a severe mental impairment.[67] When Dr. Logan reviewed the record, the prior evaluations by Dr. Bonner, Dr. Brady, and Dr. Horner were not part of the record. Instead, these evaluations were added to the record right before Mr. Brown reviewed the record in November 2022. Even though Mr. Brown had these evaluations available to

---

[64] AR 317–25.

[65] AR 321.

[66] The record does not reflect what Michael Brown's medical degree was, simply stating, "Medical Specialty Code: 38 Psychology." AR 86.

[67] AR 71–86.

review, he still determined the record in November 2022 was insufficient to rate

Plaintiff's non-exertional limitations.

　　In contrast, the ALJ found that Plaintiff's mental-status examinations and

course of treatment were sufficient to inform the ALJ as to Plaintiff's level of

mental-health functioning,[68] and so the ALJ proceeded to craft an RFC that

contained several non-exertional limitations: simple, routine tasks and

instructions, predictable environment, no fast-paced work production, occasional

and superficial interaction with the public and coworkers, no work around crowds,

instruction by demonstration or orally, and no reading as an essential function of

the job. The Commissioner is correct that this RFC contains several non-exertional

limitations; however, the RFC has no limit regarding Plaintiff's interaction with

supervisors.

　　Although there were treatment records added to the administrative record

after Mr. Brown's review, including therapy notes from July 2022 to January 2023,

the ALJ fails to meaningfully explain how the administrative record supports the

crafted RFC when the reviewing medical professionals deemed the record

insufficient to do so.[69] Rather than proceed forward without a more recent

---

[68] AR 27.

[69] *See, e.g., Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (holding an ALJ

erred in rejecting physicians' opinions and rendering his own medical opinion);

*Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot

psychological medical opinion, the ALJ should have developed the record by obtaining a consultative psychological examination. Remand for further proceedings is necessary, including a consultative psychological examination. The consultative examiner is to be given sufficient medical records to allow for a longitudinal perspective of Plaintiff's conduct disorder or adjustment disorder.[70]

**B.    Other Steps: The ALJ must reevaluate on remand.**

Plaintiff establishes the ALJ erred at step two. Therefore, Plaintiff's remaining arguments need not be addressed.

### IV.    Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process. Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for**

---

arbitrarily substitute his own judgment for competent medical opinion, and he must not succumb to the temptation to play doctor and make his own independent medical findings"); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (recognizing that as a lay person, the ALJ is "simply not qualified to interpret raw medical data in functional terms").

[70] The record must clearly identify what medical records the examiner reviewed.

1    **further proceedings pursuant to sentence four of 42 U.S.C. §**

2    **405(g)**.

3        2.     The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and**

4    **12**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

5        IT IS SO ORDERED. The Clerk's Office is directed to file this order and

6    provide copies to all counsel.

7        DATED this 9th day of April 2025.

8

9                     EDWARD F. SHEA
            Senior United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23